# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| JEFFREY W. KROL, et al., | ) |
| Plaintiffs, | ) |
| v. | ) No. 15-cv-6364 |
| JOHN J. SIEGEL, JR., | ) Judge Ronald A. Guzmán |
| Defendant. | ) |

## ORDER

The Court grants Siegel's Motion to Dismiss [25], and this case is hereby dismissed without prejudice. Civil case terminated.

## STATEMENT

This case concerns the deterioration of several business ventures between plaintiff Jeffrey Krol ("Krol") and his former associate, defendant John Siegel ("Siegel"). The following facts are from the amended complaint and presumed true for the purposes of this motion.

### I.    Background

Krol and Siegel have had a tumultuous history of business dealings since 1996. (Am. Compl. [Dkt # 18] ¶ 11.) Through this action, Krol, together with his accounting company (Jeffrey W. Krol and Associates, Ltd.) and a financial investment company of which Krol is a principal shareholder (Visco Financial Services, Ltd.), seeks to enforce a settlement agreement related to claims brought by Visco against Siegel in 2008 for Siegel's default on a multimillion dollar loan.[1] (*Id.* ¶ 13-17; *see also Visco Fin. Svc's, Ltd.*, *v. Siegel*, No. 1:08-cv-4029 (N.D. Ill.).)

---

[1] The loan was made by Visco to Fortitude Resources, Inc., but Siegel signed the promissory note as Fortitude's president and personally guaranteed it; hence, when Fortitude defaulted, the liability became his. (Am. Compl. ¶¶ 7-12.)

1

In that case, Siegel lost on summary judgment and faced nearly eight million dollars in liability. (Am. Compl. ¶ 17.) Unhappy with the outcome, he reached out to Krol in the hopes of creating a more favorable, private settlement. (*Id.* ¶ 18.) Their negotiations resulted in a final agreement signed by both Krol and Siegel on June 9, 2009 (the "Letter Agreement"). (*Id.*) For Siegel's part, he agreed to give Krol a 1.46% interest in his company, Cedars Energy, LLC ("Cedars"), and to hire Krol's accounting firm for Cedars and other companies in which he had an interest. (*Id.; see also* Letter Agreement [Dkt # 32, Ex. A] at 1-2.) Krol, in return, caused Visco to move to vacate the judgment against Siegel, and the case against Siegel was dismissed with prejudice. (Am. Compl. ¶¶ 20-21.)

Over the next few years, and despite the 2008 incident, Krol continued to work with Siegel on various projects. Particularly, in 2009, Krol and his partner Thomas Canham, through their company C&K Bowie, LLC ("C&K"), recruited investors and raised millions of dollars for Siegel's ventures, including Cedars. (*Id.* ¶ 22.) As part of these dealings, C&K also purchased a ten percent interest in Cedars. (*Id.*) But Krol was still missing something: the 1.46% interest that Siegel promised him via the Letter Agreement.

According to Krol, he spoke with Siegel about the Letter Agreement numerous times between 2009 and 2013, and each time Siegel assured him that "he would live up to his obligations without fail." (*Id.* ¶¶ 24-26.) Unfortunately for Krol, that never happened. (*Id.*) Worse still, during this same period, there were suggestions that Siegel was mismanaging Cedars' corporate funds. (*Id.* ¶ 26.) Thus, Krol and other C&K investors sought to have Siegel removed from Cedars' management, albeit unsuccessfully. (*Id.*) Siegel's response to the attempted ousting was an offer to buy out C&K. (*Id.*)

That deal was solidified on May 15, 2013, when C&K agreed to sell its interest back to Cedars for $18 million. (*Id.* ¶ 28.) The agreement was memorialized in a Membership Unit Purchase Agreement ("MUPA"), which was signed by all of the Cedars/C&K parties, including Krol and Siegel individually. (MUPA [Dkt # 32, Ex. C] at 18.) The MUPA did more than just transfer ownership in Cedars, however. It also contains a broad release/waiver provision:

> **9.1.** *By Sellers*. As of the Closing, each Seller (which, for purposes of this Section 9.1, shall specifically include Thomas Canham . . . and Jeffrey Krol . . .) agrees as follows:
>
> **(a)** Except for any obligations arising out of this Agreement, each Seller . . . hereby settles, waives, releases, and discharges any and all legal and equitable claims, demands, actions, or causes of action, known or unknown, which the Seller has or may have against Cedars or . . . Siegel . . . arising out of any fact, agreement or circumstances existing on or before the Closing Date, including, but not limited to, all claims arising from or relating to each Seller's status as a member or Manager (or Canham or Krol's status as member of the Management Committee) or Cedars, Bowie and any of their present or former Affiliates, and any other event, transaction, or communication between any of the Sellers and [Siegel].
>
> **(b)** Except for any obligations arising out of this agreement, each Seller expressly acknowledges that this Section 9.1. settles, waives, releases, and discharges any and all legal and equitable claims, demands, actions, and causes of action, known, or unknown, that each Seller has or may have against [Siegel] as of the Closing Date. Each Seller acknowledges that, by signing this agreement, each Seller may be giving up some claim, demand, or cause of action that each Seller may now have, whether known or unknown.
>
> **(c)** It is the specific intent and purpose of Section 9.1 to release and discharge [Siegel] from liability for any and all agreements, claims and causes of action, of every kind and nature whatsoever, whether known or unknown and whether or not specifically mentioned herein, which may exist or might be claimed to exist against [Siegel] at or prior to the Closing Date . . . and each Seller specifically waives any claim or right to assert that any cause of action or alleged cause of action or charge has been, through design, oversight, or error, intentionally or unintentionally, omitted from this Agreement.

(MUPA at 8-10.) Section 9.1 would appear to absolve Siegel of his responsibilities under the Letter Agreement, but Krol claims foul play: he says that Siegel represented on numerous

3

occasions that he would fulfill his promises under the Letter Agreement and that the buyout/MUPA would not modify his promises to Krol under the Letter Agreement in any way. (Am. Compl., ¶ 27.) But those conversations happened before the MUPA was fully executed. (*Id.*) Thus, when Krol broached the subject again in 2014, Siegel referred him to MUPA Section 9.1 and disclaimed any further obligations under the Letter Agreement. (*Id.* ¶ 32.)

## II. Procedural History

Believing he had been cheated, Krol filed suit in state court on May 27, 2015, alleging breach of the Letter Agreement and fraudulent misrepresentation. Siegel then removed the case to this Court and filed an answer, in which he raised the affirmative defenses of waiver/release, relying on MUPA Section 9.1. (*See* Def.'s Answer [Dkt # 6] at 9.) Krol responded by filing an amended complaint containing the following counts:

- Count I, which seeks a declaratory judgment that the MUPA is unenforceable against him;
- Count II, for breach of the Letter Agreement; and
- Count III, for fraudulent inducement regarding the MUPA.

(Dkt. # 18.)[2] Siegel then filed the instant motion seeking to dismiss all the claims against him.[3]

## **LEGAL STANDARD**

Rule 12(b)(6) authorizes dismissal of a complaint when it fails to set forth a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). In determining the sufficiency of a claim, the court construes the complaint in the light most favorable to the nonmoving party, accepts all well-pleaded facts as true, and draws all inferences in the nonmoving party's favor. *Reynolds v.*

---

[2] The claim for fraudulent misrepresentation was dropped.

[3] After Siegel filed his motion to dismiss, Krol filed yet another amended complaint, [Dkt # 32], but solely for the purpose of attaching exhibits omitted from the former amended complaint, such as the Letter Agreement and the MUPA. Both complaints are virtually identical, and the parties have stipulated that the new amended complaint and exhibits do not alter or affect the parties' positions regarding the instant motion. (*See* Stipulation Regarding Am. Compl. [Dkt. # 33] at 1-2.) The Court will therefore treat them as one.

*CB Sports Bar, Inc.*, 623 F.3d 1143, 1146 (7th Cir. 2010) (citation omitted). Courts may also consider documents attached to the complaint. *Geinosky v. City of Chi.*, 675 F.3d 743, 745 n.1 (7th Cir. 2012).

## ANALYSIS[4]

Although the parties structure their arguments according to each count, the entirety of the dispute turns on the validity and scope of the MUPA's release provision. The Court will therefore confine its discussion to those issues only.

At bottom, Siegel claims that MUPA Section 9 clearly and unambiguously waives "any and all claims, known or unknown" that Krol may have had under the Letter Agreement, and that because Krol is a sophisticated businessman who was represented by competent counsel when he signed the MUPA, he must live with the consequences of the Release. Krol, however, insists the MUPA is unenforceable for four principal reasons: (1) its terms are ambiguous; (2) the parties never intended that the MUPA would release any claims under the Letter Agreement; (3) there was inadequate consideration; and (4) he was defrauded into signing it. The Court will address each argument in turn.[5]

### I.     Ambiguity

In Kentucky, an agreement to settle legal claims is "essentially a contract subject to the rules of contract interpretation." *Cantrell Supply, Inc. v. Liberty Mut. Ins., Co.* 94 S.W.3d 381, 384 (Ky. Ct. App. 2002). A contract is ambiguous if, when viewed as a whole, "a reasonable person would find it susceptible to different or inconsistent interpretations." *Id.* at 385. To that end, Krol notes that the term "seller" is not clearly defined, in that MUPA Section 5 defines

---

[4] *For narrative purposes, Plaintiffs will be referred to collectively as "Krol."*

[5] *The MUPA contains a Kentucky choice-of-law provision regarding the interpretation of its terms, and the parties agree that Kentucky law applies. The Court will therefore interpret the MUPA according to Kentucky law. See Vencor, Inc. v. Webb*, 33 F.3d 840, 845 (7th Cir. 1994).

"sellers" as limited liability companies whereas Section 9 arbitrarily includes "Jeffrey Krol" in the definition. Worse still, he contends, the MUPA never clearly identifies the "legal identities of [himself] and Canham." (Pl.'s Resp. [Dkt # 29] at 7.) Thus, Krol argues that these ambiguities, combined with the overall purpose of the MUPA, which was to sell an interest in Cedars, leaves one guessing whether the release "was intended to extend to Krol in his individual capacity." (*Id.*)

This argument is difficult to countenance. The definition of "seller" in MUPA Section 5 is wholly immaterial, since the instant dispute concerns Section 9, which is both more specific and unambiguously identifies Krol as a seller: "As of the Closing, each Seller (which, for purposes of this Section 9.1, *shall specifically include Thomas Canham . . . and Jeffrey Krol*)." (MUPA, [Dkt # 32], Ex. C at 8) (emphasis added); *L.K. Comstock & Co. v. Becon Const. Co., 932 F. Supp. 948, 967 (E.D. Ky. 1993) ("In the interpretation of a promise or agreement . . . specific terms and exact terms are given greater weight than general language.") (citing Restatement (Second) of Contracts* 203(c) (1979)).

Equally puzzling is Krol's suggestion that the MUPA is somehow unclear about his legal identity. The Court has not found, and Krol has not cited, any principle of law suggesting that his "legal identity" must be defined elsewhere in the contract in order to make clear that the proper name "Jeffrey Krol" refers to him as an individual. MUPA Section 9 identifies both Krol and his partner by their first and last names — not by reference to any companies with which they are related. This conclusion is not disturbed by Krol's suggestion that the "purpose" of the MUPA was to effectuate a sale, since there is no language in the release indicating that it should be interpreted narrowly to apply only to those claims arising out of the C&K/Cedars transaction. Krol's argument for ambiguity is therefore a nonstarter.

## II. The Scope of the Release and the Parties' Intent

Kentucky law requires that releases be strictly construed against the drafter and that their wording be "unmistakable." *Hargis v. Baize*, 168 S.W.3d 36, 47 (Ky. 2005). In that respect, Krol claims the scope of the release is ambiguous because it does not specifically refer to any private agreements between himself and Siegel. Moreover, given the relationship between the two, Krol further maintains that it would be absurd to glean from the MUPA an intent on either his or Siegel's part to waive/release Siegel's obligations under the Letter Agreement. This point, in Krol's view, is underscored by the limiting language in Section 9.1(a): "all claims arising from or relating to each Seller's status as a Member or manager (or Canham or Krol's status as a member of the Management Committee) of Cedars, Bowie and any of their present or former affiliates." (Pl.'s Resp. at 9 (quoting MUPA § 9.1(a).) These arguments omit some important points, however.

First, while the release does not explicitly refer to the Letter Agreement, this "ambiguity" is obviated by multiple instances of universal qualifiers such as:

> [E]ach Seller . . . hereby waives ***any and all*** claims . . . ***known or unknown*** . . . which the seller may have against . . . Siegel . . . arising out of ***any*** fact, agreement, or circumstance existing on or before the closing date. . . .
>
> It is the specific intent and purpose of Section 9.1 to release . . . the Bowie Released Parties[6] from liability for ***any and all*** agreements, claims, and causes of action ***of every kind and nature whatsoever***.

(MUPA § 9.1(a), (b)) (emphasis added). This language leaves no doubt about what is covered: every preexisting claim or agreement that a Seller (Krol) may have had against a Bowie Released Party (Siegel). It thus strains credulity to hold that the Letter Agreement lies beyond scope of the release.

---

[6]Siegel is included in the definition of "Bowie Released Parties." *See* MUPA Section 9.1(a).

Second, the allegedly limiting language that Krol quotes is taken out of context. In Krol's view, the reference to "all claims arising from or relating to each Seller's status as a Member or manager" indicates that the MUPA waives only those claims related to his role in the buyout. But the preceding clause in the MUPA puts this argument to rest: "any claims . . . arising out of any fact . . . including, *but not limited to* all claims arising from or relating to each Seller's status as a member." (MUPA § 9.1(a)) (emphasis added).

And lastly, regarding the intent of the parties and their history of business dealings, the Court is sensitive to Krol's position. But this does not change the law of contracts, which is decidedly against him in this instance. It is a well-established principle of contract interpretation that in construing any written instrument, the primary objective is to ascertain the intent of the parties. *Cantrell*, 94 S.W.3d at 385. *But where the parties, following negotiations, make mutual promises, which thereafter are integrated into an unambiguous written contract and signed by them, courts will give effect only to the parties' written expressed intentions. Hoheimer v. Hoheimer*, 30 S.W.3d 176, 178 (Ky. 2000)*; Withers v. Commonwealth, Dep't of Transp., Bureau of Highways*, 656 S.W.2d 747, 749 (Ky. Ct. App. 1983). Intentions not expressed in the writing are generally deemed to be nonexistent. *Cadleway Props., Inc. v. Bayview Loan Servicing, LLC*, 338 S.W.3d 280, 286 (Ky. Ct. App. 2010). And this presumption is strongest where, as here, a written agreement contains a merger or integration clause expressly indicating that the agreement constitutes the parties' complete and final understanding. *See KFC Corp. v. Darsam Corp.*, 543 F. Supp. 222, 225 (W.D. Ky. 1982). These principles are fatal to Krol's argument.

In essence, he claims that his relationship with Siegel and their prior discussions about the Letter Agreement countenance against construing the release so broadly. Yet those intentions were not reduced to writing, despite both parties being sophisticated businessmen and having

been represented by counsel throughout the negotiation and signing of the MUPA. In addition, the release contains a provision regarding the parties' specific intent to waive all preexisting claims,[7] and the MUPA contains a merger clause indicating that the agreement encompasses the parties' entire understanding.[8] Of course, there are exceptions to the "four corners" or parole evidence rule, such as where a party claims fraud, but, as explained below, Krol's fraud claim fails as a matter of law. As such, the Court must discern the parties' intent regarding the scope of the release by reference to the contract language only, and that language quite clearly extends to "any and all" claims Krol may have had against Siegel before signing the MUPA.

### III. Consideration

Krol's contention that the MUPA was supported by inadequate consideration is easily dismissed. He relies primarily on *Sheffer v. Chromalloy Mining & Mineral Division of Chromalloy America Corporation*, 578 S.W.2d 594, 595 (Ky. Ct. App. 1979), which noted that (1) lack of consideration is a statutorily recognized exception to the parole evidence rule in Kentucky, and held that (2) allegations that no consideration was given therefore create a dispute of fact that cannot be dismissed on a judgment on the pleadings. In essence, Krol insists that this case is immune from dismissal because he has alleged inadequate consideration. But he has effectively pleaded himself out of this argument.

The complaint plainly states that Krol was a shareholder/member of C&K, (Am. Compl. ¶ 11) and that Bowie (Siegel's company) "financed the buyout with a $3 million note to [C&K]

---

[7] "It is the specific intent and purpose of Section 9.1 to release and discharge the Bowie Release parties from liability from [any and all prior agreements, claims, etc.] . . . and each Seller specifically waives any claim or right to assert that any cause of action or alleged cause of action . . . has been, through design, oversight, or error, intentionally or unintentionally, omitted from this Agreement." MUPA § 9.1(c).

[8] *See* MUPA § 11.12.

9

and made the final payment on the note on June 14, 2014," (Am. Compl. ¶ 31). Thus, C&K received a benefit for its promises under the MUPA, and by extension so did Krol.[9] This is all the law requires in the way of consideration. *See Ligon v. Parr*, 471 S.W.2d. 1, 4 (Ky. 1971).

**IV.    Fraud**

Lastly, Krol contends that the MUPA is unenforceable because he was fraudulently induced into signing it by Siegel's representation that the release would not affect the Letter Agreement. In Kentucky, such a claim requires a showing of the following six elements: (1) that the declarant made a material representation to the plaintiff; (2) that this representation was false; (3) that the declarant knew the representation was false or made it recklessly; (4) that the declarant induced the plaintiff to act upon the misrepresentation; (5) that the plaintiff relied upon the misrepresentation, and (6) that the misrepresentation caused injury to the plaintiff. *United Parcel Service Company v. Rickert*, 996 S.W.2d 464, 46 6 (Ky. 1999). This claim is critical to virtually all of Krol's arguments, since allegations of fraud in Kentucky generally carry two consequences: (1) they create a dispute of fact that precludes dismissal; and (2) they circumvent the parol evidence rule. *See Flegles, Inc. v. TruServ Corp.*, 289 S.W.3d 544, 549 (Ky. 2009). But there is a fatal flaw to Krol's position: Siegel's statement was not a statement of material fact.

---

[9] The Court notes that the Amended Complaint states that Krol received no money from the transaction, but this claim is contradicted by his response brief: "In dollar terms . . . . Krol individually received no money from the Buyout. C&K Bowie paid him $1.1 million, of which $670,000 was his original investment." (Pl.'s Resp. at 4.) Although Krol again insists that he received no money (other than his own), he gets the math wrong: by his own numbers, he received $430,000 for the buyout. But even assuming Krol truly received nothing for the transaction, it is well-settled in Kentucky that mutual promises in a release (such as Krol's and Siegel's) constitute valid consideration. *See Gibson Co. Real Estate v. Garrett, LLC*, Nos. 2011-CA-000065-MR, 2011-CA-001825-MR, 2013 Ky. App. Unpub. LEXIS 709, at *9 (Ct. App. Aug. 30, 2013) (citing *Campbell v. Campbell*, 377 S.W.2d 93 (Ky. 1964). Of course, Krol notes that fraud is an exception to this rule, but, again, as discussed below, Krol has no claim for fraud.

10

As noted above, the interpretation of a contract's terms and its consequent legal effect is a question of law. *Cantrell*, 94 S.W.3d at 384. Siegel's statement regarding the MUPA's legal effect on the Letter Agreement was therefore an opinion of law. And, unfortunately for Krol, Kentucky law does not recognize misrepresentations of law absent some confidential or fiduciary relationship, which he has not alleged. *See Backer v. Manning Family Tr.*, 51 F. App'x 522, 531 (6th Cir. 2002); *see also Compressed Gas Corp. v. United States Steel Corp.*, 857 F.2d 346, 351 (6th Cir. 1988) ("This representation, to the extent that it is a misrepresentation of law, is not actionable in Kentucky."); *Elliott v. Liberty Mut. Fire Ins. Co.*, No. 09-178-GFVT, 2010 U.S. Dist. LEXIS 87949, at *11-12 (E.D. Ky. Aug. 19, 2010) ("These statements can, at best, be construed as statements regarding the legal effect of the Policy. Therefore, because there is no statement of fact, the statements are not actionable as fraud."). Siegel's fraud claim (Count III) therefore fails as a matter of law, along with his claim that the MUPA is unenforceable (Count I).

In the end, it bears emphasis that Krol is a sophisticated businessman who was represented by counsel throughout the buyout. He could have negotiated different terms, yet he presumably read the MUPA and signed it anyway, which entailed waiving virtually any claim he may have had against Siegel before the buyout. Consequently, Count II (breach of contract) must be dismissed as well, since the Letter Agreement is no longer enforceable.

## CONCLUSION

For the reasons set forth above, the Court grants Siegel's Motion to Dismiss [25], and this case is hereby dismissed without prejudice. Civil case terminated.

**SO ORDERED.**                                   **ENTERED: March 15, 2016**

_Ronald A. Guzmán_

**HON. RONALD A. GUZMÁN**
**United States District Judge**